**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**

RAYMOND D. HURT                    *

    Plaintiff                        *

        v                        *          Civil Action No.  DKC-14-1315

WHITE, et al.                          *

    Defendants                      *
                          ***

## <u>MEMORANDUM OPINION</u>

Pending is Defendants' Motion to Dismiss or for Summary Judgment.  ECF No. 22. Plaintiff opposes the motion through a Cross-Motion for Summary Judgment[1] (ECF No. 26) and Amended Cross-Motion for Summary Judgment (ECF No. 28).  Additionally, Plaintiff seeks to amend the Complaint (ECF No. 25) and requests appointment of counsel (ECF No. 29).  The court finds a hearing in this matter unnecessary.  *See* Local Rule 105.6 (D. Md. 2014).

In his Motion for Appointment of Counsel, Plaintiff states his incarceration greatly inhibits his ability to litigate this case and that his efforts to obtain an attorney have been unsuccessful.  ECF No. 29.  A federal district court judge's power to appoint counsel under 28 U.S.C. § 1915(e)(1) is a discretionary one, and may be considered where an indigent claimant presents exceptional circumstances.  *See Cook v. Bounds*, 518 F.2d 779, 780 (4th Cir. 1975); *see also Branch v. Cole*, 686 F.2d 264, 266 (5th Cir. 1982).  Upon careful consideration of the motions and previous filings by Plaintiff, the court finds that he has demonstrated the wherewithal to either articulate the legal and factual basis of his claims himself or secure meaningful assistance in doing so.  No hearing is necessary to the disposition of this case and

---

[1]     Plaintiff's Cross-Motion for Summary Judgment simply states that the Complaint is sufficient to refute Defendants' Motion to Dismiss or for Summary Judgment.  ECF No. 26.

there are no exceptional circumstances that would warrant the appointment of an attorney to represent Plaintiff under §1915(e)(1).  The Motion for Appointment of Counsel shall be denied.

### Background

Plaintiff, Raymond D. Hurt, is an inmate confined to North Branch Correctional Institution ("NBCI") in Cumberland, Maryland.  He asserts that On April 26, 2011, Case Manager, Mr. White, "sanctioned Plaintiff's placement into a housing unit (housing unit 4, NBCI) which contained numerous known and flagged members of [Plaintiff's] known and flagged enemy gang, DMI."  ECF No. 1 at p. 3.  Plaintiff claims that, two days after his placement in housing unit 4, he was stabbed thirteen times in the face, neck and head.  *Id*. Following the assault, Plaintiff was charged with an institutional infraction asserting he was the aggressor in the fight.  As a result of the infraction, Plaintiff lost certain property and received one year of disciplinary segregation.  Plaintiff claims the infraction is "fraudulent" and that surveillance video will establish he was run down by two knife-wielding inmates and "subsequently chopped up."  *Id*.  Plaintiff maintains he was unarmed when the assault occurred. *Id*.  Plaintiff asserts this assault was ordered by the Aryan Brotherhood.  *Id*. at ¶ 7.

Plaintiff further alleges that in June of 2011 he was transferred from NBCI to Western Correctional Institution ("WCI").  At that time his assigned case manager, Mr. Bittinger, ignored the fact that Plaintiff is a known white supremacist, and oversaw Plaintiff's placement into a cell with inmates who are known enemies.  Plaintiff states that at that time there was documentation of his prior altercations with the DMI, the Bloods, and the Aryan Brotherhood security threat groups.  Plaintiff claims this assignment resulted in several "pit fights" or fights staged between Plaintiff and his cellmates at the behest of correctional officials.  ECF No. 1 at p. 3.[2]

---

[2]     Plaintiff seeks to amend the Complaint to include correctional officer Barnes as a Defendant.  ECF No. 25.  Plaintiff states only that Barnes "is added in light of a June 2011 assault."  *Id*.  Plaintiff provides no

The first of the alleged pit fights occurred on November 10, 2011, "days after" Plaintiff was placed into a cell with an Hispanic inmate (Moreno #365638), who Plaintiff claims is a member of the MS-13 gang.  Plaintiff states he was not injured during the fight, but received an infraction "for defending himself in this corrections staff orchestrated fight."  *Id*.

Plaintiff claims he was involved in another forced altercation on November 29, 2011, minutes after being placed in a cell with inmate Garrison, who Plaintiff states is a known member of the Bloods.  Plaintiff states that both Bittinger and Lt. Miller, who was in charge of the housing unit where the fight occurred, are responsible for the fight occurring.  He further claims that he sustained "objectively serious" injuries and was charged with an institutional infraction.  *Id*.

Plaintiff states he was moved into a cell with inmate Bennett, who Plaintiff asserts was a known member of the Aryan Brotherhood.[3]  On March 6, 2012, Bennett cut Plaintiff's face numerous times with a razor blade and he sustained "objectively serious" injuries.  Plaintiff asserts he did not receive an institutional infraction following this altercation.  *Id*.  Four days after this assault, Plaintiff was transferred back to NBCI, where he claims he was immediately subjected to threats by correctional officers "regarding impending additional prison time for [Plaintiff's] actions" during the November 29, 2011 forced altercation.  *Id*.

---

allegations in the proposed amendment or in the Complaint regarding what role Barnes is alleged to have played in a June 2011 assault.  "[A] district court may deny leave if amending the complaint would be futile—that is, if the proposed amended complaint fails to satisfy the requirements of the federal rules."  *Katyle v. Penn Nat. Gaming, Inc.* 637 F.3d 462, 471 (4th Cir. 2011), citing *United States ex rel. Wilson v. Kellogg Brown & Root, Inc.*, 525 F.3d 370, 376 (4th Cir. 2008).  Where, as here, the Amended Complaint fails to state a claim and provides no notice to the Defendant of the nature of the alleged conduct so that a viable defense may be asserted, the amendment is a futility.  *See* Fed. R. Civ. Proc. 8(a)(2) (requiring averments in a complaint to be simple concise and direct), *see also Erickson v. Pardus*, 551 U.S. 89, 94 (2007) (complaint must provide enough detail to illuminate the nature of the claim and allow Defendants to respond).  The Motion to Amend shall be denied.

[3]      Plaintiff asserts that because he had previous altercations with members of the gangs to which his assailants belonged, he should have never been housed with members of those gangs.  ECF No. 1 at p. 4.

Plaintiff claims that, on May 10, 2012, he was being escorted by one officer back to his housing unit after a dental appointment when an unknown officer in central control opened the main gate and allowed over fifty unrestrained inmates into the area where Plaintiff was located. At the time of his escort, Plaintiff was in handcuffs.  Plaintiff states that many of the inmates who walked past him were members of gangs that are his enemy, but "by some miracle" he was not attacked.  *Id*.  Plaintiff characterizes this action as an orchestrated attempt to have him murdered by another inmate.  *Id*.

Plaintiff adds that Defendants have exhibited a callous disregard for his safety in retaliation for the numerous grievances he has filed.  He alleges his complaints have been ignored by Defendants Zais and Bishop.  He claims, as an example of the harassment to which he has been subjected, that a correctional officer instructed another inmate housed in a cell next to him to repeatedly flush his toilet in an effort to cause Plaintiff anxiety.  ECF No. 1 at p. 4.

Plaintiff states that, on November 29, 2013, he "sustained a gaping one-inch by one-half inch muscle-deep wound on his outer forearm."  *Id*.  He asserts that Dr. Ottey instructed RN Kristi Cortez[4] not to suture the wound, forcing Plaintiff to "go about with his innards largely exposed until natural healing occurred by December 30, 2013."  *Id*.  Plaintiff claims he filed an administrative remedy procedure request ("ARP") regarding the failure to suture the wound and appealed the warden's denial to the Commissioner and the Inmate Grievance Office ("IGO"), but heard nothing in response.  *Id*., *see also* ECF No. 1-7.

Defendants admit Plaintiff was assaulted by two inmates on April 28, 2011, and that Plaintiff sustained serious injuries as a result.  An investigation into the assault by the Internal Investigation Unit ("IIU"), however, revealed that the assault occurred as a result of a

---

[4]      Cortez is not a named Defendant in the instant case.  Through clerical error Ottey was not noted as a Defendant in the caption of this case and was never served with the Complaint.  For reasons stated below, the claims against them shall be dismissed without requiring service.

disagreement between Plaintiff and his assailants, followed by a threat made by Plaintiff. Plaintiff was assaulted by inmates Michael Gross and Shawn Jones when cell doors were opened for inmates to exit and report for dinner.  Gross and Jones exited their separate cells and ran toward the back of the tier where they assaulted Plaintiff.  ECF No. 22 at Ex. 1, p. 9.[5]  Gross, who was the main assailant, had a weapon which was fashioned from a metal speaker cover later determined to be taken from inside his cell.  The weapon was attached to a glove Gross was wearing on his right hand.[6]  *Id*. at pp. 10 – 11, 12, and 19.  In addition to the weapon removed from Gross' hand, two smaller knife-like weapons were recovered from the scene of the assault. ECF No. 22 at Ex. 1, pp. 14 and 26.

Jones was interviewed regarding the assault.  He explained that Plaintiff had been moved from housing unit #1 to housing unit #4 a week earlier.  *Id*. at p. 12.  It was Jones' understanding that Plaintiff was going to be placed in a behavior modification program for inmates who were on segregation and, once in general population would participate in the program.  *Id*.  Jones claimed he was a "mentor" for the inmates in the program and that he tried "to steer trouble inmates in the right direction."  *Id*.  Jones explained that on the day before the assault, Plaintiff, Gross, and Jones were in the recreation yard together.  *Id*.  At that time, Plaintiff made a comment to Jones about Jones being on medication for hepatitis C and referred to the medication as a "Jew" medication.  *Id*. at p. 13.  Jones expressed that Plaintiff should "go about his business" and told Plaintiff he was no longer interested in trying to get him into the program.  *Id*.  Jones

---

[5]     Page numbers referenced are the page numbers assigned by Defendants and not the ECF numbering.

[6]     The weapon was further described as a "brown work glove inside a gray work glove.  Tied around the gloves were two brown boot laces attaching them to a metal plate approximately 4.5 inches x 4.5 inches x 1/8 inches."  ECF No. 22 at Ex. 1, p. 19.  Additionally, it was noted that "Inmate Gross also had a length of green bed sheet attached to his right arm with clear packing tape covering his arm from wrist to elbow."  *Id*.

offered that the exchange upset him because "he was only trying to help another 'white guy.'" *Id*.

Jones claimed that on the day of the assault, he was doing laundry and Plaintiff approached him and said, "'I'm coming at you at dinner, be on point.'" *Id*. Jones then admitted that when he was let out of his cell for dinner, he went down to where Plaintiff's cell was "and tried to kill him." *Id*. Jones claimed Plaintiff was a threat and alleged that it was he, not Gross, who had struck Plaintiff with the speaker cover. *Id*. Review of the video surveillance by IIU confirmed that Gross was the main culprit in the assault on Plaintiff while Jones punched Plaintiff in the face and body. *Id*. at p. 9. Additionally, a search of the cells occupied by Gross and Jones confirmed the speaker cover was missing from Gross' and not Jones' cell. *Id*. Inmate Gross did not provide a statement to IIU, but after initially refusing to comment stated, "man threatened my life. I had to what I had to do" as he departed the office.[7] *Id*. at p. 14.

Plaintiff was transported to the Western Maryland Regional Medical Center for treatment of his injuries immediately following the assault. *Id*. at p. 8. Shortly after his arrival in the emergency room, Plaintiff was taken to surgery and was unavailable to provide a statement to the IIU investigator. *Id*. On April 29, 2011, another attempt was made to interview Plaintiff at the hospital, but, at that time, Plaintiff was in the Intensive Care Unit, sedated, and on a ventilator. *Id*. at p. 15.

Medical reports regarding Plaintiff's injuries were provided to the IIU and established he had been stabbed seven times in the left side of his neck with the most serious of the wounds being 31 cm. *Id*. at p. 16. Plaintiff also suffered a partial skull fracture. *Id*. Inmate Gross sustained a laceration to his left hand. *Id*.

---

[7] Jones and Gross were charged with assault and related offenses, resulting in additional sentences of 15 years for Jones and 16 years for Gross. ECF No. 22 at Ex. 1, p. 15; Ex. 5 and Ex. 6.

Plaintiff was later released from the hospital and transferred to the infirmary at Western Correctional Institution, where he was interviewed by the IIU investigator on May 2, 2011. ECF No. 22 at Ex. 1, p. 17. Plaintiff claimed during the interview he could not remember what happened the day of the assault after walking out of his cell, but admitted to having a problem with another inmate earlier in the day. *Id.* Plaintiff further stated that this inmate had been disrespectful to him in the recreation yard on the evening prior to the assault and admitted telling the inmate if he had a problem they could "settle it at dinner time." *Id.* at p. 18. He claimed he did not know the identity of his assailants or where their assigned housing was located. Plaintiff further advised he would not testify at any judicial proceeding regarding the incident. *Id.* According to the OBSCIS Alerts and OBSCIS II Classification Data reviewed by the IIU investigator, Plaintiff is a validated member of the Security Threat Group, Aryan Brotherhood;[8] Gross is a validated member of "an unidentified Security Threat Group, 'White Supremacist;'" and Jones is a validated member of Dead Man Inc. *Id.*, *see also* ECF No. 22, Ex. 2. Following Plaintiff's assault, both Gross and Jones were documented as Plaintiff's enemies, but had not been previously listed as such. ECF No. 22 at Ex. 10, pp. 1 – 2.

Plaintiff was placed on administrative segregation pending disciplinary proceedings after his release from the WCI infirmary. He was charged with possession of a weapon after it was determined the two smaller knife-like weapons found at the scene of the April 28, 2011 assault were used by Plaintiff during the fight. ECF No. 22 at Ex. 3, pp. 7 – 10 and 14 – 16. On May 10, 2011, Plaintiff was found guilty of violating rule 102 (assault or battery on another inmate), 105 (possession of a weapon), and 400 (disobeying a direct lawful order). *Id.* at p. 9. At the hearing, Plaintiff maintained he did not know what was happening and asked the hearing officer to view the video of the assault. *Id.* at p. 8. The request for review of the video was

---

[8]     Plaintiff maintains he is a white supremacist. ECF No. 26 at p. 1.

denied based on the prison's policy to not provide videos during disciplinary hearings.  *Id*.  The

hearing officer, Jon Sandstrom, observed that Plaintiff "offered no explanation to account for at

least two reports from staff in which he was observed with a weapon  . . . striking another

inmate."  *Id*. at p. 9.  He further found that the reports provided by staff were credible and

reliable, while he found Plaintiff's "defense was half-hearted and perfunctory" and that "it did

not ring true."  *Id*.  The hearing officer concluded that Plaintiff was "involved in a violent act

against an inmate with a weapon and refused orders to stop this activity."  *Id*.  As a penalty,

Plaintiff was given a total of 300 days segregation, continued indefinite loss of visits, and

revocation of 300 days good conduct credits.  *Id*. at p. 10.  Upon review of Plaintiff's appeal,

Warden Shearin reduced the disciplinary segregation sentence to a total of 250 days; the

remaining penalties remained unchanged.  *Id*. at p. 2.

On June 7, 2011, Defendant John White, who was the Administrative Segregation Case

Manager at NBCI from March 1, 2009 through October 14, 2012, received a letter from Plaintiff

wherein he made threats that he would break away from an escort and assault White, Ms. Smith,

and Lt. Harbaugh.[9]  A similar letter was received by Ms. Smith.[10]  ECF No. 22 at Ex. 7 and Ex.

8, pp. 44 – 49.  On the same day the letters were received, Plaintiff broke free from an officer's

escort, ran down the hallway into Lt. Harbaugh's office, and "needed to be controlled."  *Id*. at

Ex. 8, p. 48.  Following that incident, White wrote a Notice of Assignment to Administrative

Segregation and Plaintiff was placed on administrative segregation on June 9, 2011.  *Id*. at Ex. 7.

At an administrative segregation review held on June 23, 2011, the rationale for keeping Plaintiff

---

[9]      The letter to Mr. White contains anti-Semitic remarks and advises, "at any given time in this coming week you should probilly (sic) be sitting in a fetal position under your desk . . . cause your (sic) about to hear some Aryan boots marching."  ECF No. 22 at Ex. 12, p. 12.

[10]      The letter to Ms. Smith notes it is "from Racist Ray Hunt," contains sexual innuendo, and states that when he is "on [his] way to Harbaugh's office this week" he planned to run into Smith's office, sexually assault her, and go to Harbaugh's office to "headbutt his crooked ass and steal some of his shit."  ECF No. 22 at Ex. 12, pp. 13 and 14.

on that status noted that, "Hurt has an enemy at NBCI and has a high potential for future assaults as a result of his strong racial opinions and the frequency of which he verbalizes those opinions." *Id*. at Ex. 8, pp. 48 – 49.   John White was chairman of the administrative segregation review team. *Id*. at p. 48.

In an internal memorandum from NBCI Acting Chief of Psychology Bruce Liller to John White regarding Plaintiff's suitability for assignment to general population dated April 11, 2011, Liller notes that:

> Inmate Hurt is currently being treated for depression while Ms. Moulden is attempting to rule out Bi-polar.  What appears to be the issue of concern is a longstanding racist mind set (white supremacy) that Ms. Moulden views as increasing his potential to violence.
>
> At this time after reading the documentation from Ms. Moulden and Dr. Schellhase, there is nothing that portrays inmate Hurt as an *imminent threat* to act on his longstanding racist beliefs.  He is not actively threatening someone by name or culture.  However he has made it public his disdain for celling with someone from a different culture but I have experienced effective management of persons like him in general population by acknowledging that it may be best to cell him with a person of similar characteristics.

ECF No. 22 at Ex. 8, p. 42 (emphasis in original).   Another internal memorandum from Lt. Damon Thomas of NBCI indicates that Plaintiff is so well established as a white supremacist in the Maryland Division of Correction that his placement in general population is problematic and that an interstate transfer should be considered. *Id*. at p. 31.

Despite this documentation, Plaintiff was assigned to a cell with German Medina Moreno while at WCI.  Defendants do not dispute Plaintiff's allegation that Moreno was a validated member of MS-13, an Hispanic gang.  Prior to the altercation that occurred between Plaintiff and Moreno, a phone call from Plaintiff's mother was received by Brenda Smith, Inmate Affairs Coordinator at WCI.  ECF No. 22 at Ex. 9, p. 6.  On October 31, 2011, Smith notified Becky Baker that Plaintiff's mother expressed concern regarding an allegation made by Plaintiff in a

letter to her stating that correctional officers were attempting to have a cellmate kill him.  *Id*. There is no evidence that any action was taken on the basis of that phone call.  On November 10, 2011, Plaintiff and Moreno were seen in their assigned cell exchanging closed fist punches.  *Id*. at Ex. 13, p. 2.  Plaintiff was charged with violation of rule 102 (assault and battery on another inmate) and pled guilty to the charges.  *Id*. at pp. 7 – 11.  As a penalty, Plaintiff received 365 days of disciplinary segregation and lost 120 days of good conduct.  *Id*.

Defendants also do not dispute that inmate Brandon Garrison, also assigned to share a cell with Plaintiff, was a confirmed member of the Bloods gang.[11]  Plaintiff's assertion that he was placed in a cell with Garrison on November 29, 2011, is also not disputed by Defendants. On November 30, 2011, Plaintiff was seen in the cell holding Garrison in a headlock and stabbing him in the head with a pointed object.  ECF No. 22 at Ex. 14, p. 2.  Although ordered to release Garrison, Plaintiff continued his assault until pepper spray was deployed into the cell.  *Id*. Upon releasing Garrison, Plaintiff flushed the weapon and another object down the toilet.  *Id*.

Plaintiff was again charged with assaulting another inmate as well as interfering with the duties of the officers.  At an adjustment hearing was held on December 12, 2011, Plaintiff claimed the incident did not happen.  *Id*. at p. 4.  The hearing officer found the reports written by the officer more persuasive than Plaintiff's denial and relied on the report as well as pictures of injuries to Garrison to find Plaintiff guilty of both rules charged.  Plaintiff was sentenced to 180 days of disciplinary segregation with a loss of 120 days good conduct.  *Id*. at p. 6.

The third assault involving Plaintiff and a cellmate occurred on March 6, 2012.  At that time, Plaintiff was assigned to a cell with inmate Donald Bennett.  ECF No. 22 at Ex. 15.

---

[11]     "Bloods on the east coast are often referred to as the United Blood Nation (UBN).  The UBN was founded by African American inmates in the New York City Department of Corrections in 1993 to protect themselves from attacks by Latino prison gangs."  http://gangs.umd.edu/Gangs/Bloods.aspx.

Defendants do not dispute that Bennett was a member of the Aryan Brotherhood[12] or that the assault took place one day after Plaintiff was assigned to the cell with Bennett.  On the date of the assault, Officer Fontaine heard Bennett yelling "don't spray, don't spray" and reported to the cell.  ECF No. 22 at Ex. 15, p. 4.  Fontaine observed both Plaintiff and Bennett covered in blood and both required sutures for the wounds sustained during the fight.  *Id*.  Plaintiff was charged with violating rule 102, but at a hearing held on March 27, 2012, he was found not guilty.  *Id*. at p. 14.

At the adjustment hearing Plaintiff did not attribute the assault to Bennett's membership in the Aryan Brotherhood, but instead testified that Bennett is a white supremacist and that he did not like Plaintiff talking to blacks.  *Id*.  Plaintiff was found not guilty of the adjustment charges because "[t]he photos reveal [Plaintiff] was attacked with a weapon . . . photos show his face is sliced open in at least two places."  *Id*.  The hearing officer noted that the photographs of Bennett did not depict injuries consistent with the use of a weapon by Plaintiff and concluded that any actions taken by Plaintiff were "essentially in self-defense."  *Id*.

Defendant Bittinger was the case manager for the disciplinary segregation unit at WCI when Plaintiff was housed there.  He asserts that "[a]n altercation between inmates where one or both are known security threat groups (STG) members does not constitute any inmate labelled as that particular STG to be listed as an enemy."  ECF No. 22 at Ex. 16.  He further asserts that as a case manager his "responsibility was to place enemy alerts on the offender based state correctional system (OBSCIS)" and to "track enemies of inmates being removed from disciplinary segregation and returning to general population to ensure that listed enemies on

---

[12]        Plaintiff maintains that Jones was a member of the Aryan Brotherhood and following the April 28, 2011 assault, the Aryan Brotherhood gang represented a threat to his safety.  ECF No. 1.

OBSCIS were not housed together in general population at WCI." *Id.* Bittinger denies any responsibility regarding cell assignments and states that is handled by custody staff. *Id.*

Defendant Miller states he was a correctional officer with the rank of Sergeant at WCI when Plaintiff was housed there and he worked in the disciplinary segregation unit (housing unit 4). ECF No. 22 at Ex. 17. Miller denies that one of his duties was to oversee movement and housing arrangements in housing unit 4 and claims that housing assignments were conducted on the 8-to-4 shift, unless there was an emergency.[13] Miller further denies forcing Plaintiff into cells with enemies or to live in close proximity with known enemies. *Id.* Plaintiff was transferred from WCI to NBCI on March 9, 2012, where he is currently housed as a Maximum II Security Status inmate. ECF No. 22 at Ex. 9, p. 2.

### Standard of Review

Summary Judgment is governed by Fed. R. Civ. P. 56(a) which provides that:

> The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.

The Supreme Court has clarified that this does not mean that any factual dispute will defeat the motion:

> By its very terms, this standard provides that the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact.

*Anderson v. Liberty Lobby, Inc*., 477 U. S. 242, 247-48 (1986) (emphasis in original).

"The party opposing a properly supported motion for summary judgment 'may not rest upon the mere allegations or denials of [his] pleadings,' but rather must 'set forth specific facts showing that there is a genuine issue for trial.'" *Bouchat v. Baltimore Ravens Football Club,*

---

[13] Although Miller states he currently works the "3 to 11 Shift" at NBCI, he does not state what shift he worked while assigned at WCI. ECF No. 22 at Ex. 17.

*Inc.*, 346 F.3d 514, 525 (4th Cir. 2003) (alteration in original) (quoting Fed. R. Civ. P. 56(e)).

The court should "view the evidence in the light most favorable to . . . the nonmovant, and draw

all inferences in her favor without weighing the evidence or assessing the witness' credibility."

*Dennis v. Columbia Colleton Med. Ctr., Inc.*, 290 F.3d 639, 644-45 (4th Cir. 2002). The court

must, however, also abide by the "affirmative obligation of the trial judge to prevent factually

unsupported claims and defenses from proceeding to trial." *Bouchat*, 346 F.3d at 526 (internal

quotation marks omitted) (quoting *Drewitt v. Pratt*, 999 F.2d 774, 778-79 (4th Cir. 1993), and

citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 323-24 (1986)).

**Analysis**

Exhaustion of Administrative Remedies

Defendants raise the affirmative defense of non-exhaustion and assert Plaintiff's claims

that have not been properly presented through the administrative remedy procedure must be

dismissed pursuant to 42 U.S.C. §1997e. ECF No. 22. The Prisoner Litigation Reform Act

provides, in pertinent part:

> (a) Applicability of administrative remedies
> No action shall be brought with respect to prison conditions under
> section 1983 of this title, or any other Federal law, by a prisoner
> confined in any jail, prison, or other correctional facility until such
> administrative remedies as are available are exhausted.

42 U.S.C. § 1997e.

As a prisoner, Plaintiff is subject to the strict requirements of the exhaustion provisions.

It is of no consequence that Plaintiff is aggrieved by a single occurrence, as opposed to a general

conditions of confinement claim. *See Porter v. Nussle*, 534 U.S. 516, 528 (2002) (no distinction

is made with respect to exhaustion requirement between suits alleging unconstitutional

conditions and suits alleging unconstitutional conduct). Exhaustion is also required even though

the relief sought is not attainable through resort to the administrative remedy procedure. *See Booth v. Churner*, 532 U.S. 731, 741 (2001). A claim which has not been exhausted may not be considered by this court. *See Jones v. Bock*, 549 U.S. 199, 220 (2007).

Administrative remedies must, however, be available to the prisoner and this court is "obligated to ensure that any defects in administrative exhaustion were not procured from the action or inaction of prison officials." *Aquilar-Avellaveda v. Terrell*, 478 F.3d 1223, 1225 (10th Cir. 2007). The Fourth Circuit has addressed the meaning of "available" remedies:

> [A]n administrative remedy is not considered to have been available if a prisoner, through no fault of his own, was prevented from availing himself of it. *See Aquilar-Avellaveda v. Terrell*, 478 F. 3d 1223, 1225 (10th Cir. 2007); *Kaba v. Stepp*, 458 F. 3d 678, 684 (7th Cir. 2006). Conversely, a prisoner does not exhaust all available remedies simply by failing to follow the required steps so that remedies that once were available to him no longer are. *See Woodford v. Ngo*, 548 U.S. 81, 89 (2006). Rather, to be entitled to bring suit in federal court, a prisoner must have utilized all available remedies "in accordance with the applicable procedural rules," so that prison officials have been given an opportunity to address the claims administratively. *Id*. at 87. Having done that, a prisoner has exhausted his available remedies, even if prison employees do not respond. *See Dole v. Chandler*, 438 F.3d 804, 809 (7th Cir. 2006).

*Moore v. Bennette*, 517 F. 3d 717, 725 (4th Cir. 2008).

Thus, Plaintiff's claims must be dismissed if Defendants raise the affirmative defense and also prove that Plaintiff has failed to exhaust available remedies. *See Jones*, 549 U.S. at 216 – 17 (failure to exhaust is an affirmative defense and inmates are not required to demonstrate exhaustion in their complaints). The PLRA's exhaustion requirement is designed so that prisoners pursue administrative grievances until they receive a final denial of the claims, appealing through all available stages in the administrative process. *Chase v. Peay*, 286 F. Supp. 2d 523, 530 (D. Md. 2003); *Booth*, 532 U.S. at 735 (affirming dismissal of prisoner's claim for failure to exhaust where he "never sought intermediate or full administrative review after prison authority denied relief"); *Thomas v. Woolum*, 337 F.3d 720, 726 (6th Cir. 2003) (noting that a

prisoner must appeal administrative rulings "to the highest possible administrative level"); *Pozo v. McCaughtry*, 286 F. 3d 1022, 1024 (7th Cir. 2002) (prisoner must follow all administrative steps to meet the exhaustion requirement, but need not seek judicial review).

Defendants assert Plaintiff filed an ARP on May 12, 2012, concerning the incident where he was escorted restrained during a mass movement.  ECF No. 22 at Ex. 18.  The ARP was dismissed on May 15, 2012, with instructions to Plaintiff to resubmit the complaint with the names of the officers involved by May 30, 2012.  *Id*. at p. 7.  On May 19, 2012, Plaintiff resubmitted the ARP stating he did not have the resources to ascertain the names of the officers involved.  *Id*. at p. 6.  On May 25, 2012, the resubmitted ARP was dismissed for failing to comply with the coordinator's instructions.  *Id*.  In his appeal of the procedural dismissal to the Commissioner of Correction dated June 4, 2012, Plaintiff asserted that "[a]sking me to provide the officers name was the literal equivalent of asking me to walk through my wall or grow wings" and argued that asking him for information impossible for him to obtain in order to file an ARP was offensive.  *Id*. at p. 3.  Plaintiff further pointed out that, given the security breach outlined in his complaint, the response was unprofessional and rendered the ARP process ineffective.  *Id*.  The appeal was dismissed on June 20, 2012, because Plaintiff "failed to resubmit the request in accordance with the coordinator's instructions."  *Id*. at p. 2.  Plaintiff filed a second appeal dated June 15, 2012, providing more details regarding the circumstances of his escort.  *Id*. at p. 1.  This appeal was dismissed as repetitive.  *Id*.

The court finds that the claim concerning Plaintiff's escort while restrained during a mass movement is exhausted.  It is clear from the evidence submitted by Defendants that administrative remedies were unavailable to Plaintiff for purposes of this claim.  Insisting on information from a prisoner that is readily available to staff, but not to prisoners, forecloses any

meaningful access to the procedure itself.  *See Moore*, 517 F. 3d at 725 (exhaustion means providing prison officials with the opportunity to respond to a complaint through proper use of administrative remedies).

Plaintiff filed an ARP on June 4, 2012, claiming John White disregarded Plaintiff's safety on April 26, 2011, when he assigned Plaintiff to general population resulting in the assault on Plaintiff by Jones and Gross.  ECF No. 22 at Ex. 19.  This ARP was dismissed as untimely.  Plaintiff offers no evidence to rebut the defense of non-exhaustion regarding this particular claim.  ECF No. 26.  Thus, the court concludes that this claim has not been properly exhausted and must be dismissed.

On June 5, 2012, Plaintiff filed an ARP regarding Bittinger's failure to place certain gangs on his enemies list.  ECF No. 22 at Ex. 20.  Plaintiff described in detail his attempts to communicate with Bittinger about placing the Bloods and the Aryan Brotherhood on his enemies list and that if the gangs could not be placed on the list, he should be assigned to protective custody.  *Id*. at pp. 4 – 5.  He further explained Bittnger never responded to any of his letters.  *Id*.  Plaintiff stated that the latest date of his attempts to communicate with Bittinger was May 10, 2012.  *Id*. at p. 4.  On June 6, 2012, the ARP coordinator dismissed the ARP because "additional information is needed to investigate your request" and directed Plaintiff to provide a description of the last occurrence.  *Id*.

On June 13, 2012, Plaintiff resubmitted the ARP and stated the last occurrence wherein his life was jeopardized was when he was being escorted while restrained in three point restraints and "somehow" was led past a large crowd of inmates.[14]  *Id*. at p. 3.  He stated he is the target for three and possibly four gangs and could have been attacked.  *Id*.  The ARP was dismissed as repetitive and because it did not comply with the instructions for resubmission.  *Id*.

---

[14]        Plaintiff provides the escorting officer's name in this ARP.

Plaintiff appealed the dismissal to the Commissioner of Correction on June 25, 2012. *Id.* at p. 1.   In his appeal Plaintiff argues his resubmission was in accordance to the ARP coordinator's instructions and that the issues raised were part of an ongoing problem he was having with officers attempting to endanger his life. *Id.*  The appeal was dismissed on July 14, 2012, for procedural reasons, stating Plaintiff failed to resubmit the request in accordance with the coordinator's instructions. *Id.*

To the extent this claim raised a case management issue regarding Plaintiff's enemies list and his housing assignment, it was not addressable through the ARP process and the claim is exhausted. *See* ECF No. 22 at Ex. 22, p. 1 (ARP response dismissing as non-addressable claims regarding case management decisions).  With respect to Plaintiff's escort on May 10, 2012, the claim is exhausted and the merits of that claim are addressed below.

Plaintiff filed another ARP on December 12, 2012, regarding the wound on his arm he sustained on November 29, 2011, which would not heal.  ECF No. 22 at Ex. 21.  He stated in the ARP that it is in supplement to an earlier filed ARP. *Id.* at p. 2.  He alleged that medical staff are attempting to murder him by leaving the wound open and exposing him to the risk of infection. *Id.* at pp. 2 – 3.  The ARP was dismissed as repetitive to one that was already addressed. *Id.* at p. 2.  Defendants do not provide a copy of the earlier filed ARP or the response provided to it; thus, it is not possible to discern whether Plaintiff's ARP was found meritorious, obviating the need for further appeal.  This claim will be addressed as exhausted.

On February 21, 2014, Plaintiff filed an ARP concerning his claim that there had been a systematic attempt to end his life by medical staff, correctional officers, and case management staff.  ECF No. 22 at Ex. 22.  This ARP was dismissed on February 28, 2014, as untimely and because "inmates may not seek relief through the Administrative Remedy Procedure regarding

Case Management recommendations and decisions." *Id.* at p. 2.   No appeal was filed.   The issues related to Plaintiff's housing assignments are exhausted for purposes of this case.

<u>Failure to Protect Claim</u>

In order to prevail on an Eighth Amendment claim of failure to protect from violence, Plaintiff must establish that Defendants exhibited deliberate or callous indifference to a specific known risk of harm. *See Pressly v. Hutto*, 816 F.2d 977, 979 (4th Cir. 1987).   "Prison conditions may be restrictive and even harsh, but gratuitously allowing the beating or rape of one prisoner by another serves no legitimate penological objective, any more than it squares with evolving standards of decency.   Being violently assaulted in prison is simply not part of the penalty that criminal offenders pay for their offenses against society." *Farmer v. Brennan*, 511 U.S. 825, 833-34 (1994) (citations omitted).   "[A] prison official cannot be found liable under the Eighth Amendment for denying an inmate humane conditions of confinement unless the official knows of and disregards an excessive risk to inmate health or safety, the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Id.* at 837, *see also Rich v. Bruce*, 129 F.3d 336, 339-40 (4th Cir. 1997).

Plaintiff's claim that he was improperly celled with members of enemy gangs following his assault by members of DMI and Aryan Brotherhood is not directly addressed by Defendants. Rather, Defendants state that Moreno, Garrison, and Bennett were not known enemies of Plaintiff prior to being placed in a cell with Plaintiff.   ECF No. 22 at Memorandum, p. 21. Defendants further maintain that the mere fact that an inmate is an established member of a certain gang is not enough to warrant placing that inmate's name on an enemies list. *Id.* Defendants rely on the fact that, following the altercations Plaintiff had with Moreno, Garrison,

and Bennett, their names were placed on Plaintiff's enemies list.  The record, however, supports the conclusion that Case Management and correctional staff knew that Plaintiff is racist and is vocal about his racist beliefs.  Notwithstanding that fact, Moreno and Garrison, who are members of gangs made up of minorities, were assigned to share a cell with Plaintiff.[15]  In the altercations that involved Moreno and Garrison, however, Plaintiff was established as the aggressor, a fact which he does not dispute.  ECF No. 28 at pp. 3 – 4.  Plaintiff cannot claim a violation of his Eighth Amendment right to be free from cruel and unusual punishment where he is the instigator of violence.

With respect to the assault on Plaintiff by Bennett, a member of the Aryan Brotherhood, it is clear that Bennett was the aggressor.  Plaintiff maintains that a member of the Aryan Brotherhood should not have been placed in his cell following the assault he suffered on April 28, 2011, wherein another member of the Aryan Brotherhood attacked him.  The investigative record following the April 28, 2011 assault does not support Plaintiff's claim that the assault occurred because the Aryan Brotherhood had targeted him.  Rather, Plaintiff exchanged words with Jones and actually told Jones he was going to assault him at dinner time.  The resulting violent attack on Plaintiff appeared to be the result of the verbal exchange between Plaintiff and Jones and not a "gang hit."  Thus, there is no evidence that any of the Defendants knew or should have known that Bennett posed a threat to Plaintiff.  Defendants are entitled to summary judgment in their favor on the Eighth Amendment claim raised.

<u>Due Process</u>

Prisoners retain rights under the Due Process Clause, but prison disciplinary proceedings are not part of a criminal prosecution and the full array of rights due a defendant in such

---

[15]     Plaintiff states in his Amended Cross-Motion for Summary Judgment that Moreno is of Latino descent and Garrison is African-American.  ECF No. 28 at p. 3.

proceedings does not apply.  *See Wolff v. McDonnell*, 418 U.S. 539, 556 (1974) (citing *Morrissey v. Brewer*, 408 U.S. 471, 488 (1972)).  In prison disciplinary proceedings where an inmate faces the possible loss of diminution credits, he is entitled to certain due process protections.  These include:  (1) advance written notice of the charges against him; (2) a written statement of the evidence relied on and the reasons for taking any disciplinary action; (3) a hearing where he is afforded the right to call witnesses and present evidence when doing so is not inconsistent with institutional safety and correctional concerns, and a written decision; (4) the opportunity to have non-attorney representation when the inmate is illiterate or the disciplinary hearing involves complex issues; and (5) an impartial decision-maker.  *See Wolff*, 418 U.S. at 564-571.  There is no constitutional right to confront and cross-examine witnesses or to retain and be appointed counsel.  *See Baxter v. Palmigiano*, 425 U.S. 308, 322 (1976); *Brown v. Braxton*, 373 F.3d 501, 505-06 (4th Cir. 2004).  As long as the hearing officer's decision contains a written statement of the evidence relied upon, due process is satisfied.  *See Baxter*, 425 U.S. at 323 n. 5.  Moreover, substantive due process is satisfied if the disciplinary hearing decision was based upon "some evidence."  *Superintendent, Mass. Correctional Institute v. Hill*, 472 U.S. 445, 455 (1985).  Federal courts do not review the correctness of a disciplinary hearing officer's findings of fact.  *See Kelly v. Cooper*, 502 F.Supp. 1371, 1376 (E.D.Va.1980).  The findings will only be disturbed when unsupported by any evidence, or when wholly arbitrary and capricious.  *See Hill*, 472 U.S. at 456; *see also Baker v. Lyles*, 904 F.2d 925, 933 (4th Cir. 1990).  As long as there is some evidence in the record to support a disciplinary committee's factual findings, a federal court will not review their accuracy.

Plaintiff's generalized claim regarding the disciplinary proceedings against him is that the charges against him were fraudulent and he was improperly charged for defending himself.  ECF

No. 1.   The record of the hearing officers' decisions, however, reflect that credibility determinations were made and there was "some evidence" to support the findings of guilt. Additionally, in the disciplinary charges filed against Plaintiff for the incident involving Bennett, he was found not guilty.   There is no evidence that Plaintiff has lost good conduct credit on the basis of falsified allegations or proceedings that did not meet constitutional requirements.   This court will not review the accuracy of credibility determinations made by the hearing officers in the context of Plaintiff's disciplinary proceedings or weigh the evidence relied upon.   Defendants are entitled to summary judgment on this claim.

Medical Claim

The Eighth Amendment prohibits "unnecessary and wanton infliction of pain" by virtue of its guarantee against cruel and unusual punishment.   *Gregg v. Georgia*, 428 U.S. 153, 173 (1976).   "Scrutiny under the Eighth Amendment is not limited to those punishments authorized by statute and imposed by a criminal judgment."   *De'Lonta v. Angelone*, 330 F. 3d 630, 633 (4th Cir. 2003) *citing Wilson v. Seiter*, 501 U.S.294, 297 (1991).   In order to state an Eighth Amendment claim for denial of medical care, a plaintiff must demonstrate that the actions of the defendants or their failure to act amounted to deliberate indifference to a serious medical need. *See Estelle v. Gamble*, 429 U.S. 97, 106 (1976).   Deliberate indifference to a serious medical need requires proof that, objectively, the prisoner plaintiff was suffering from a serious medical need and that, subjectively, the prison staff were aware of the need for medical attention but failed to either provide it or ensure the needed care was available.   *Farmer v. Brennan*, 511 U.S. 825, 837 (1994).

Plaintiff's allegation that he had an open wound on his arm[16] that medical staff refused to suture does not state a constitutional claim.   The decision whether to suture a wound is a medical decision and Plaintiff's disagreement with that decision does not state an Eighth Amendment claim.   Plaintiff admits the wound healed on its own.   He does not allege the failure to suture it caused him unnecessary pain, nor does he allege the wound showed any signs of infection as a result of the failure to suture it.   To the extent any of the correctional Defendants in this case knew of the issue with Plaintiff's arm and could have intervened on his behalf, the claim itself fails to establish the need was serious inasmuch as Plaintiff admits the wound healed without the need for sutures.   Defendants are entitled to summary judgment in their favor on this claim and the claim against Dr. Ottey will be dismissed without requiring service.

## Retaliation Claim

In order to prevail on a claim of retaliation, Plaintiff "must allege either that the retaliatory act was taken in response to the exercise of a constitutionally protected right or that the act itself violated such a right."   *Adams v. Rice*, 40 F.3d 72, 75 (4th Cir. 1994).   It is unclear how much of a showing of adversity must be made in order to survive a motion for summary judgment.   *See Burton v. Livingston*, 791 F.2d 97, 100-101 (8th Cir. 1986) ("complaint that a prison guard, without provocation, and for the apparent purpose of retaliating against the prisoner's exercise of his rights in petitioning a federal court for redress, terrorized him with threats of death" sufficient to state claim).   "'A complaint which alleges retaliation in wholly conclusory terms may safely be dismissed on the pleading alone.'"   *Gill v. Mooney,* 824 F.2d

---

[16]       Plaintiff's assertion that he was made to "linger 30 full days with [a] broken jaw" relates to an incident occurring on October 7, 2010.   ECF No. 1 at p. 4.   That claim, to the extent it was intended to be raised as a claim, is time-barred as the Complaint was filed more than three years after the date of the occurrence.   *See Board of Regents, Univ. of New York v. Tomanio*, 446 U.S. 478, 488 (1980) (state statutes of limitation most analogous to claims raised under 42 U.S.C. §1983 are to be adopted for those claims).   In Maryland the applicable statute of limitations is three years from the date of the occurrence.   *See* Md. Cts. & Jud. Proc. Code Ann. § 5-101.

192, 194 (2nd Cir. 1987) (quoting *Flaherty v. Coughlin*, 713 F.2d 10, 13 (2nd Cir. 1983)); *Pierce v. King*, 918 F. Supp. 932, 945 (E.D. N.C. 1996) (conclusory allegations of retaliation insufficient to state claim).

> Retaliation, though it is not expressly referred to in the Constitution, is nonetheless actionable because retaliatory actions may tend to chill individuals' exercise of constitutional rights. *Perry v. Sindermann,* 408 U.S. 593, 597 (1972). Where there is no impairment of the plaintiff's rights, there is no need for the protection provided by a cause of action for retaliation. Thus, a showing of adversity is essential to any retaliation claim.

*ACLU of Maryland, Inc. v. Wicomico County*, Md. 999 F.2d 780, 785 (4th Cir. 1993).

"In the prison context, we treat such claims with skepticism because '[e]very act of discipline by prison officials is by definition 'retaliatory' in the sense that it responds directly to prisoner misconduct.'" *Cochran v. Morris*, 73 F.3d 1310, 1317 (4th Cir. 1996), quoting *Adams v. Rice*, 40 F.3d 72,74 (4th Cir. 1994). To the extent Plaintiff claims that all of the decisions regarding his housing assignments, disciplinary proceedings, and other actions taken by Defendants are retaliatory, the claim fails.

Plaintiff's assignment to general population was not the cause of his assault on April 28, 2012; rather, his provocative conversation with one of the assailants was the cause. While Plaintiff is free to vocalize his beliefs in white supremacy, speech of that nature in a prison is not without consequence. In short, correctional officials are not charged with protecting Plaintiff from attacks he himself has provoked. Additionally, each of the decisions to charge Plaintiff with violating institutional rules and to transfer him to another prison were supported by legitimate security concerns. Defendants are entitled to summary judgment on this claim.

Administrative Remedies

Plaintiff's claim that his ARPs were dismissed without investigation fails to state a constitutional claim.   A claim regarding the failure to provide meaningful access to the administrative remedy procedure is essentially a claim of denial of access to courts.   The tools required by *Bounds v. Smith*, 430 U. S. 817, 821 (1977) "are those that the inmates need in order to attack their sentences, directly or collaterally, and in order to challenge the conditions of their confinement."   *Lewis v. Casey*, 518 U. S. 343, 355 (1996).   Impairment of other capacities to litigate are consequential to incarceration and are constitutional.   *Id*.   The failure to investigate Plaintiff's claims, without more, is simply not enough to sustain such a claim inasmuch as investigation of ARP claims plays no role in satisfying the exhaustion requirement under 42 U.S.C. § 1997e(a).[17]   Defendants are entitled to summary judgment on this claim.

A separate Order follows.


  April 1, 2015         _____/s/_____
Date                              DEBORAH K. CHASANOW
                                  United States District Judge

---

[17]      That provision establishes that "[n]o action shall be brought with respect to prison conditions under § 1983 of this title, or any other Federal law by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted."  42 U.S.C. §1997e(a).